Margaret L. PELZ et al.

v.

The UNITED STATES.

No. 8-74.

United States Court of Claims.

March 23, 1977.

Eugene M. Moen, Seattle, Wash., attorney of record, for plaintiffs. Halverson,

Strong, Moen & Chemnick, Seattle, Wash., of counsel.

Kenneth R. Pike, Washington, D. C., with whom was Acting Asst. Atty. Gen. Myron C. Baum, Washington, D. C., for defendant. Theodore D. Peyser and Donald H. Olson, Washington, D. C., of counsel.

Before COWEN, Senior Judge, NICHOLS and KASHIWA, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on defendant's motion, filed January 3, 1977, moving that the court adopt the recommended decision of Senior Trial Judge Mastin G. White, filed November 16, 1976, pursuant to Rule 134(h), as the basis for its judgment in this case, plaintiff having failed to file a notice of intention to except thereto and the time for so filing having expired. Upon consideration thereof, without oral argument, since the court agrees with the said recommended decision, as hereinafter set forth,* it hereby grants defendant's motion and affirms and adopts the decision as the basis for its judgment in this case. Therefore, it is concluded that plaintiffs are not entitled to recover and their petition is dismissed.

## OPINION OF TRIAL JUDGE

### WHITE, Senior Trial Judge:

Margaret L. Pelz, Rochelle E. Snee, Patrick Michael McKeehan, and Ante T. Elezovic [1] ("the plaintiffs") were teaching assistants in the Classics Department of the University of Washington during certain quarter-years in the 1967–71 period, and they received from the university monthly stipends while holding such teaching assistantships. In addition to performing the teaching duties required of them as teaching assistants, the plaintiffs were enrolled in the Classics Department as full-time graduate students pursuing courses of study leading to the degree of Doctor of Philosophy in the classics.

The Internal Revenue Service required the plaintiffs to pay federal income taxes on the stipends which they received as teaching assistants; and the plaintiffs now sue to recover the amounts so paid, together with statutory interest.

The plaintiffs contend that their monthly stipends as teaching assistants did not constitute taxable income because: (1) subsection (a) of section 117 of the Internal Revenue Code of 1954 (26 U.S.C. § 117(a)) provides in part that an individual's gross income does not include any amount received "as a scholarship at an educational institution" or "as a fellowship grant"; (2) the pertinent regulation (26 C.F.R. § 1.117–3(a) and (c)) defines a "scholarship" and a "fellowship grant" in similar language as "an amount paid or allowed to, or for the benefit of," a student (or other individual, in the case of a fellowship grant) to "aid" such individual in pursuing his or her studies (or research, in the case of a fellowship grant); and (3) as shown by the evidence in this record, the primary purpose of the Classics Department in awarding teaching assistantships to the plaintiffs and to other graduate students was to provide financial assistance to the recipients as they pursued their courses of study leading to the doctorate in the classics.

Therefore, according to the plaintiffs, their stipends as teaching assistants should be regarded as scholarships or fellowship grants for income tax purposes, even if such stipends were not so designated in the nomenclature of the University of Washington.

The graduate program leading to the doctorate in the classics was inaugurated by the Classics Department of the University

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed November 16, 1976, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. The plaintiff Laine Henline Elezovic is the wife of Ante T. Elezovic and is a party to this action only because she joined her husband Ante T. Elezovic in filing income tax returns for periods that are involved in the litigation.

of Washington in 1960, and has been continued until the present time. In order to compete with other prestigious universities and attract promising doctoral candidates in the field of the classics, and thus make possible the continuation of the program for Ph.D. candidates, it has been, and still is, necessary for the Classics Department to be able. to offer and provide financial assistance of some sort to most of the graduate students taking part in this program (although financial need, *per se,* has never been a factor in awarding financial assistance to particular graduate students).

During the years involved in the present litigation, the Classics Department was able to make financial assistance available to its graduate students principally in the form of teaching assistantships, and secondarily in the form of National Defense Education Act ("NDEA") fellowships. For example, the number of teaching assistantships awarded to graduate students in the Classics Department ranged from a high of 18 in 1968 (when 9 NDEA fellowships were awarded) to a low of 11 in 1971 (when 5 NDEA fellowships were awarded). None of the plaintiffs ever held an NDEA fellowship (or any other form of grant denominated a fellowship or scholarship by the University of Washington) during the period in question, but all of them were awarded and held teaching assistantships.

Funds for the NDEA fellowship grants were derived from the Federal Government, while funds for the stipends of the teaching assistants were derived from the State of Washington, in accordance with the procedure outlined in the next succeeding paragraph of this opinion.

The state legislature made available to the University of Washington, out of the general fund of the State of Washington, money for instructional and teaching purposes, by approving a university budget which provided for faculty "counts" on the basis of a formula that evaluated instructional needs in terms of the number of student credit hours (at different levels of difficulty) taught during the previous year. The university administration, on the basis of the same formula, allocated the faculty "counts" to the different colleges and schools comprising the university. The College of Arts and Sciences, of which the Classics Department was and is a part, made a further allocation of the college's faculty "counts" to the departments comprising the college, including the Classics Department. A faculty "count" authorized the maintenance by a department of one regular faculty position or four teaching assistantships.

A department within the College of Arts and Sciences, including the Classics Department, had the discretionary authority to determine the extent to which its faculty "counts" would be used for the maintenance of regular faculty positions and the extent to which the "counts" would be used for the maintenance of teaching assistantships.[2] The Classics Department consciously chose to utilize its allocation of faculty "counts" in order to maintain an unusually large number of teaching assistantships, in comparison with the number of regular faculty positions maintained by the department. In 1968, for example, the Classics Department had 17 teaching assistants and only 8 regular faculty members. This disproportion of teaching assistants in relation to faculty members was decided upon by the department because it was necessary for the department to offer and provide financial assistance to graduate students in order to attract promising doctoral candidates, and funds from other sources for this purpose were limited. From the standpoint of the Classics Department, therefore, the teaching assistantships were regarded primarily as a means of providing financial assistance to promising graduate students in order to maintain a viable doctoral program in the classics.

In my opinion, however, the primary purpose or motivation of the Classics Depart-

---

2. The dean of the college exercised general supervision in this field and could act to prevent abuses of discretion.

ment in establishing and maintaining the teaching assistantships is not controlling, or even particularly significant, in the present case. The money with which to pay the stipends of the teaching assistants came out of the general fund of the State of Washington and was made available by the state legislature to the University of Washington specifically for the procurement of instructional and teaching services. The use of this money for grants, gifts, or gratuities of any kind would have been outside the scope of the legislative authorization. Under a state statutory provision (Revised Code of Washington Annotated 43.88.160(2)(d)), it was necessary to certify that "services have been rendered" in connection with the disbursement of this money.

From the standpoint of the State of Washington (which provided the money for the stipends of teaching assistants), from the standpoint of the University of Washington, and from the standpoint of the College of Arts and Sciences, teaching assistants were persons employed to provide instructional and teaching services to university students.

Furthermore, the plaintiffs (and other teaching assistants in the Classics Department) actually were required to, and did, perform teaching services in order to receive their stipends. Teaching assistants were supposed to work on a half-time basis and to devote approximately 20 hours per week to the performance of their duties (although their actual working time was generally less than 20 hours per week). Ordinarily, a teaching assistant in the Classics Department was assigned to teach two courses (or sections of courses) each quarter, although sometimes, when undergraduate enrollment in the classics courses was comparatively low (this was apt to be true in the spring quarter), a teaching assistant might be assigned to teach only one course (or section) during a quarter. It should be mentioned, in this connection, that a teaching assistant's stipend remained the same, irrespective of whether he was assigned to teach two courses or only one course during a particular quarter.

That the plaintiffs and the other teaching assistants in the Classics Department rendered valuable services to the department and to the university is shown by the fact that, according to the evidence, it would have been necessary for the department to appoint additional regular faculty members to handle the teaching load in the department during the 1967–71 period if the services of the teaching assistants had not been available. It is pertinent to note, in this connection, that the teaching assistants performed their teaching duties with very little, if any, supervision from the regular faculty members. The teaching assistants were, in actuality, teachers like the regular faculty members, although lacking tenure and employed on a year-by-year basis, up to a maximum of 5 years; and the teaching assistants, like the regular faculty members, were paid for their services out of a fund provided by the State of Washington for the procurement of instructional services.

The University of Washington made a sharp distinction between teaching assistants, on the one hand, and the holders of fellowships, on the other hand, in the following respects (among others): (1) teaching assistants were required to furnish teaching services in order to receive their stipends, while fellows were not required to furnish any sort of service in return for their stipends; (2) teaching assistants' stipends were paid with money provided by the State of Washington for the procurement of instructional services, while fellows' stipends were paid with non-state money donated to the University of Washington; (3) teaching assistants were paid through the payroll system, while fellowship payments were made through the financial accounting system; (4) teaching assistants were placed on the payroll through the use of an "Employment Notice" form, while fellows were appointed through the use of a "Grant-in-Aid, Fellowship, or Trainee Appointment" form; (5) teaching assistants received cost-of-living increases, while fellows did not; and (6) income taxes and social security taxes were withheld on amounts paid to teaching assistants, but no

such withholdings were made on amounts paid to fellows.

It must be concluded that the plaintiffs' stipends as teaching assistants were not fellowship grants or scholarships, as those terms are used in subsection (a) of section 117 of the Internal Revenue Code of 1954, but, rather, were payments for services rendered and, hence, were subject to the income tax.

Furthermore, even if the plaintiffs' stipends had been officially designated as fellowship grants or scholarships in the local terminology, such stipends would still be taxable.

Subsection (b)(1) of section 117 of the 1954 Code provides in part as follows:

(b) *Limitations.—*

(1) *Individuals who are candidates for degrees.*—In the case of an individual who is a candidate for a degree at an educational institution \* \* \*, subsection (a) [excluding scholarships and fellowship grants from gross income] shall not apply to that portion of any amount received which represents payment for teaching \* \* \* or other services in the nature of part-time employment required as a condition to receiving the scholarship or the fellowship grant. If teaching \* \* \* or other services are required of all candidates \* \* \* for a particular degree as a condition to receiving such degree, such teaching \* \* \* or other services shall not be regarded as part-time employment within the meaning of this paragraph.

As stated previously in this opinion, the stipends received by the plaintiffs represented "payment for teaching \* \* \* in the nature of part-time employment required as a condition to receiving" the stipends in question; and the teaching done by the plaintiffs was not "such teaching" as was required of all candidates for the Ph.D. degree in the classics.

It is true that the Classics Department in 1968 adopted a rule, which was applicable prospectively to graduate students entering that department's doctoral program in 1968 or thereafter, whereby a doctoral candidate must have "teaching experience" in order to qualify for the Ph.D. degree in the classics. Neither the amount nor the nature of the required teaching experience is specified in the rule. However, there is nothing in the record to indicate that the rule requires "all candidates" for the Ph.D. degree in the classics to have the kind or the extent of teaching experience that the plaintiffs had as teaching assistants during the 1967–71 period.

In any event, therefore, the plaintiffs' stipends as teaching assistants would be removed from the scope of subsection (a) of section 117 of the 1954 Code, even if such stipends had been called fellowship grants or scholarships.

It necessarily follows that the plaintiffs are not entitled to recover, and the petition should be dismissed.

## CONCLUSION OF LAW

Upon the trial judge's findings and opinion, which are adopted by the court, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and the petition is therefore dismissed.