MELISSA J. RUSSELL AND THOMAS C. NEWMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Russell v. Commissioner
Docket No. 5983-85.
United States Tax Court
T.C. Memo 1987-216; 1987 Tax Ct. Memo LEXIS 222; 53 T.C.M. (CCH) 692; T.C.M. (RIA) 87216; April 29, 1987. Barry Becker, for the petitioners. Anne W. Durning, for the respondent. DINAN
MEMORANDUM OPINION DINAN, Special Trial Judge: This case was heard pursuant to section 7456(d) (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, section 1556, 100 Stat. 2755) *223 of the Code and Rules 180, 181 and 182. [1] For convenience and clarity, the findings of fact and conclusions of law have been combined in this opinion. Respondent determined deficiencies in Melissa J. Russell's [2] Federal income taxes for the taxable years 1981 and 1982 in the amounts of $2,062.00 and $1,190.00, respectively. The issue for decision is whether amounts received by petitioner from the University of Minnesota during 1981 and 1982 constituted scholarship or fellowship payments excludable from income under section 117. Some of the facts have been stipulated. The stipulations of fact and exhibits attached thereto are incorporated by this reference. At the time the petition herein was filed, petitioner resided in Phoenix, Arizona. *224 In 1978, petitioner enrolled as a candidate for a Ph.D. degree with a major field in Educational Psychology (Special Education) at the University of Minnesota. She was one of 10 candidates who enrolled in the program in that year. All Ph.D. candidates in the Special Education Program were required to teach, do individual research, and perform community services in special education as part of their practicum experience and were so informed by identical memoranda issued to each of them by the Department of Psychoeducational Studies at the University. The Special Education Program was a four-year program and each of the 10 candidates in the program received payments from the University during each of the four years. The source of the fund from which the payments were made to each of the candidates was a block grant from the Department of Education, Bureau of Education for the Handicapped. In the first year of the program, each of the 10 candidates received a payment of $4,700. In each of the three succeeding years, the payments increased but each of the 10 candidates received identical amounts in each year. [3]
*225 Because of the varied experiences of the candidates prior to enrolling in the program, the time spent by them on their practicums differed. Some spent more time on their practicum than others. The time spent on the required activities, i.e., teaching, research and community activities, also varied in accordance with each candidates' career objective in the field of Special Education. Petitioner received $8,978 from the University in 1981 and $5,552 in 1982. [4] She excluded those amounts from her gross income in 1981 and 1982 on the ground that they were scholarships or fellowships. Respondent, on the other hand, claims that the payments are not excludable from income pursuant to section 117. We hold for petitioner. Section 117(a) excludes from gross income amounts received as a scholarship or fellowship. Where an individual is a degree candidate, section 117(b)(1) limits the exclusion by providing that section 117(a) is inapplicable to any amount received which represents payment for teaching, research, or other *226 services in the nature of part-time employment required as a condition to receiving the scholarship or fellowship grant. If certain services are required of all candidates as a condition to receiving such degree, however, such services are not to be regarded as part-time employment. A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research. Section 1.117(3)(c), Income Tax Regs. Amounts paid as compensation for past, present, or future employment services are not considered as scholarships or fellowship grants. Section 1.117-4(c), Income Tax Regs. In upholding the validity of section 1.117-4(c), the Supreme Court said: Here, the definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of "scholarships" and "fellowships" as relatively disinterested, "no-strings" educational grants, with no requirement of any substantial quidproquo from the recipients. Bingler v. Johnson,394 U.S. 741, 751 (1969). In Reese v. Commissioner,45 T.C. 407 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967), *227 we held at page 413: We think that a proper reading of the statute requires that before the exclusion comes into play there must be a determination that the payment sought to be excluded has the normal characteristics associated with the term "scholarship." Only if the "amount received" is a "scholarship" does the limitation and the exception thereto become operative. The test to be applied is whether the primary purpose for making the payment was to educate the recipient or to pay him for services rendered. Yarlott v. Commissioner,78 T.C. 585, 595 (1982), affd. 717 F.2d 439 (8th Cir. 1983). During 1981 and 1982, petitioner was a graduate assistant in the Special Education Program at the University. To be appointed as a graduate assistant, an individual was required to have a bachelor's degree, to have demonstrated an above-average ability in acquiring that degree, to be enrolled at the University of Minnesota as a graduate student, and to be making substantial progress towards an advanced degree. As a graduate assistant, petitioner assisted in teaching; taught various special education courses on mainstreaming, emotional disturbance, program *228 development for the Education Department (E.D.) and behavior management; and conducted literature reviews to update annotated bibliographies for use by students and teachers of special education. She assisted in the conduct of research and behavior management strategies; she observed and critiqued the teaching content and style of practicum students in the E.D. licensure program. Petitioner managed a summer practicum training program involving 15 students in training and advised students on their preparation for certification in special education teaching in Minnesota and on professional organizations and journals in their field of interest. All candidates for the Ph.D degree in Special Education were required to demonstrate that they had satisfactorily participated in ongoing or independent research, college teaching and other practical experiences consistent with their career objectives. The various activities engaged in by petitioner as a graduate assistant, supra, met the requirements for obtaining the Ph.D degree in Special Education. Petitioner's activities as a graduate assistant were closely supervised by her professor-advisor. Each of the 10 candidates for a Ph. *229 D degree in the Special Education Program received the same amount in each year of the program regardless of the number of hours spent on their practicum experience and regardless of the proportion of time spent on the areas chosen by them for their practicum experience in accordance with their career objectives. The number of hours spent by each candidate on his practicum experience was not reported to anyone. The block grant provided to the University from the Federal Government through the Department of Education, Bureau of Education for the Handicapped, in order to make payments to the Ph.D degree candidates in Special Education, was intended to create a national pool of Special Education Experts. During the entire time that petitioner was enrolled in the Special Education Program, the University did not provide her any medical insurance, life insurance, tuition discount, housing allowance, vacation pay, sick leave or free or discounted laundry service, nor was she permitted to participate in the University of Minnesota Retirement Plan. Respondent notes that the University withheld Federal and State income taxes from the amounts paid petitioner in 1981 and 1982. We have *230 previously held that such action is not significant. Bhalla v. Commissioner,35 T.C. 13, 17 (1960). See, also Reese v. Commissioner,supra at 416, n. 5. Finally, respondent claims that the Ph.D degree candidates in the Special Education Program were not required, as a condition of meeting their degree requirements, to perform reasonably equivalent services. We disagree. We have learned from the evidence in this case that Special Education addresses itself to different handicapping conditions. Some of the handicapped are mentally retarded, some emotionally disturbed, some physically handicapped and some are the learning disabled. The decision of a candidate to concentrate his efforts in any one of these handicapped groups will require an allocation of different proportions of time to the three prongs of the required practicum experience, i.e., teaching, research and community service. Each of the candidates, however, is required to have some practicum experience in each of the three activities. This clearly requires reasonably equivalent services of all the candidates for the Ph.D degree in Special Education. Steiman v. Commissioner,56 T.C. 1350 (1971). *231 Based upon the evidence in this record, we find that the amounts received by petitioner from the University of Minnesota in 1981 and 1982, which were not included in her gross income in those years, constitute scholarships or fellowships excludable from gross income under section 117. Decision will be entered for the petitioners.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Thomas C. Newman is a party to this action solely because he filed a joint return with Melissa J. Russell for 1981 and 1982. All further references to petitioner will be to Melissa J. Russell.↩
3. There is no evidence in the record of the amounts paid to the candidates in the second, third and fourth years of the program.↩
4. The University was on the quarter system, i.e., the fall, winter and spring quarter. The academic year, therefore, includes parts of two calendar years.↩